BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**PAUL T. MALONEY, OSB #013366**
Assistant United States Attorney
Paul.Maloney@usdoj.gov
**GARY Y. SUSSMAN, OSB #87356**
gary.sussman@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | 3:13-CR-00557-SI |
| **STEVEN DOUGLAS ROCKETT,** | **GOVERNMENT'S TRIAL MEMORANDUM** |
| **Defendant.** | |

The United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Paul T. Maloney and Gary Y. Sussman, Assistant United States

Attorneys, submits the following trial memorandum for the Court's consideration in this case.

## I.    STATUS OF THE CASE

Defendant is charged in a second superseding indictment with three counts of Producing

Child Pornography in violation of 18 U.S.C §§ 2251(a), (c) and (e); two counts of Engaging in

Illicit Sexual Conduct with a Minor in Foreign Places, in violation of 18 U.S.C §§ 2423(c) and

(e); three counts of Attempted Production of Child Pornography in violation of 18 U.S.C

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 1**

§§ 2251(a) and (e); and Possession of Child Pornography in violation of 18 U.S.C.

§§ 2252A(a)(5)(B) and (b)(2).  The indictment contains two forfeiture allegations – one under 18

U.S.C. § 2253 for the child pornography counts, and one under 18 U.S.C. §2428 for the illicit

sexual conduct in foreign places counts.

## II.    STIPULATIONS

Defendant has agreed to stipulate to the business records foundation for records obtained

by law enforcement from Facebook, Inc., pursuant to an Oregon state search warrant.  The

parties had agreed on redactions from the video recording of defendant's custodial interview to

satisfy defendant's *Miranda* motion.  However, the government no longer intends to offer

defendant's statement in its case in chief.  There are no other stipulations between the parties. [1]

## III.    STATEMENT OF FACTS

### A.  Forest Grove Investigation

In March 2013, defendant's ex-wife, Christine Jumoa-as Rockett, told Forest Grove

Police Detective Matt Smith that she suspected that defendant may have sexually abused their

two sons.  She also reported that defendant engaged in suspicious activities with young boys

while the two of them were in the Philippines.

Ms. Rockett was born in the Philippines.  She met defendant when he visited her country

in January 2000, and married him when he returned later that year.  Although she moved to the

United States with defendant, they returned to the Philippines periodically so she could visit her

family.

---

[1]  The government did not and does not stipulate that defendant's statements during the custodial
interview are admissible if offered by defendant.  Offered by defendant, they are inadmissible
hearsay.

**GOVERNMENT'S TRIAL MEMORANDUM**                                      **Page 2**

When they visited the Philippines, defendant would "get kids" and go to a hotel with them.  Ms. Rockett reported that children told her that defendant "liked to take pictures of it." She described how on one of those visits, possibly in August or September 2005, she followed defendant to the Golden Peak Hotel in Cebu City, Philippines, and found him playing strip poker with several boys from her barangay (local neighborhood) in the hotel room.  She identified the children in a photo from defendant's Flicker account depicting several Filipino boys on a bed in a hotel, and said the photo was taken in the Golden Peak Hotel.  Ms. Rockett described seeing naked pictures of a child on Steven Rockett's computer, and stated that she believed they were naked photos of children from the Philippines.  She saw those photos when she lived with defendant in their Aloha home, and that it was "a long time ago."

Several weeks later, Ms. Rockett contacted Det. Smith to report that her sister, Charis, who still lived in the Philippines, had been in contact with defendant via Facebook.  She recounted additional concerns about defendant's Facebook communications with Charis.  Ms. Rockett gave Det. Smith her sister's login information and assured the police they had her sister's permission to look at her communications.  Det. Smith accessed the account and read communications in which defendant was soliciting Charis to take photos of naked children.

Det. Smith sought and obtained a state search warrant for defendant's Facebook records. Det. Smith reviewed those records and learned that defendant was soliciting other Filipino children for "private" images.  In an online conversation with Charis Jumoa-as (Christine Rockett's sister), defendant wrote that he would send her care packages if she would take lewd photos of two particular children – Charis' daughter *HJ,* and *MG*, another young girl, together, and send the photos to him at stevenrockett@comcast.net.  Defendant wrote he "would like to have more private pictures of [*HJ*] and [*MG*]."  When Charis asked "what kind," defendant

responded, "no clothes would like to see how healthy they are and be able to see how their bodies change as they get older."  Defendant specifically requested "Just make sure it is a lot of pictures and shows front and back and no shy. And no worry, only I will ever see the pictures."

Defendant later suggested a tactic Charis Jumoa-as could use to induce the girls to pose for naked photos.  Defendant wrote, "Just have them model swim suits and take pictures and then have them take off swim suits and take pictures front and back."  The Facebook records contain many more conversations between the defendant and other young Filipino males and females in which he is offering to send them care packages, electronics, "digicams" (digital cameras) and money if they will send him "privacy" pictures that are "just for him" and "not to share."

Charis-Jumoa-as said that *HJ* was reluctant to pose without her clothes.  Charis wrote, "[*HJ*] don't like tobe naked because she heard rumors about you of many children here also here friends. That you will take picture naked and sale it. I heard only from [*HJ*] to that  humors. Came from many children and friends here. I said to [*HJ*] just ignore them. That's not true." [2] Defendant replied, "I will not sale them. I can only say they would be private for me only. Can not say anymore then that. I have no naked pictures of her friends. It is Roger that they need to be careful of, that is why I have nothing to do with him anymore. But I will have to deal with not paying some bills because of all the money I have give to Christine right now. So [*HJ*] will have to give something also."

Det. Smith also found conversations between defendant and a young girl identified herein as *NS* within the Facebook records he received in response to the search warrant.  Those conversations were from April and May 2013.  Defendant asked NS for some "high quality"

---

[2]  All spelling and grammatical errors are as they appear in the online communications.

**GOVERNMENT'S TRIAL MEMORANDUM**                                                **Page 4**

photos of her that show "how you have grown and changed since the last time we see you." Defendant insisted that the pictures be "good quality" and "no shy," telling her to "stand back and hold the camera higher up and point it downwards to get full picture." In later conversations *NS* described how the phone defendant purchased for her was stolen. Defendant offered to replace the phone, but informed *NS* that she will have to come over to his house to "work for a replacement phone." *NS* understood that to mean that she would have to engage in sex acts with defendant. *NS* responded, "*Ill just go without one i don't want to do that stuff again… i have nightmares cus of it and i cry my self to sleep alot sense then…*" (emphasis added).

### B. Washington County Sheriff's Investigation

In May, 2013, Cheryl Schneider contacted the Washington County Sheriff's office to report concerns about the defendant. Her 13-year-old daughter, *NS,* told her that defendant had promised to replace a stolen iPhone if *NS* would take lewd images of herself and send them to him. *NS* showed her mother the Facebook communications between herself and defendant where defendant was inducing *NS* to take lewd images of herself in the shower and send him the images. Defendant told her he wanted photos "from the knees up," "front and back and no shy," and said he wanted "to see how you are developing." *NS* later reported that she knew defendant wanted naked photos because defendant had taken naked photos of her in the past.

Cheryl Schneider told the police that *NS* and her older sister had stayed with defendant for extended periods of time while Schneider and her husband experienced periods of instability and homelessness. *NS* later described how defendant had isolated her, groomed her, and eventually sexually abused her during the times that she and her sisters stayed with him. *NS* described how the abuse began initially with the defendant asking her and her sisters to weigh themselves with their clothes off. Defendant made comments about *NS*'s physical appearance

**GOVERNMENT'S TRIAL MEMORANDUM**                                           **Page 5**

and development.  Defendant progressed to fondling NS's genitals and breasts, then to penetration, intercourse, and oral and anal sodomy.  Defendant gave NS favorable treatment to buy her silence, which consisted of privileges and gifts – including the cell phone defendant offered to replace if NS would send him lewd pictures.  The police later learned that both of NS's older sisters reported being sexually abused by defendant, and that NS's oldest sister was also photographed by defendant.

Sheriff's detectives sought and obtained a search warrant for defendant's Forest Grove residence.  They recovered numerous digital media storage devices, including tower computers, laptop computers, cellphones, digital cameras, gaming consoles, digital video recorders and loose media drives.  Investigators found two alarm clocks that had digital cameras hidden inside of them.  In defendant's master bedroom, investigators found a black wire running from the wall into the crawl space.  They traced the wire hand-over-hand until finding it connected to a pin-hole-camera mounted inside a wall in a guest bathroom.  The camera was mounted inches from the ceiling and opposite the vanity.  The camera was angled down and toward the bathroom mirror so it would capture the entire bathroom, including the reflection of anyone standing in front of the mirror above the vanity sink.

### C.    Digital Evidence Analysis

The electronic data devices were submitted to the Northwest Regional Computer Forensic Laboratory (NWRCFL) for analysis.  Mike Hanada (a former Beaverton Police Detective and computer forensic analyst) examined a Dell tower computer that was recovered from defendant's home office.  That computer (hereafter referenced as the office tower) had a single user account on the system ("stevens") with a password of "SteveR10."  The office tower had two external drives associated with it.  One external drive had a two terabyte capacity and

contained a large volume of family photos.  The other external drive was a 250 gigabyte drive that was encrypted using software called "DriveCrypt."  Investigators were unable to access the encrypted drive.

There were two internal one terabyte drives within the tower computer.  The first internal drive contained non-contraband images of *NS*, as well as seven photos of naked children.  The drive also had a folder called "Begging" that appeared to contain screen captures of online chats between a profile named "srockett" and children and young adults from the Philippines.  The second internal drive contained many documents associated with defendant (divorce records, tax records, and resume), photos of his family, photos from defendant's sons' baseball games, and contraband images. Technicians recovered what they believed were 86 images of prepubescent children engaged in lewd and lascivious exhibitions of their genitals, and a file titled "oopreviews.rar" – a compressed file that had 97 photos of children and young looking people posing in a sexually suggestive manner or otherwise exposing their genitals in a lewd and lascivious way.

The investigators attempted to recover the internet browsing history from the office tower, however it appeared that much of the internet history had been wiped from the system using an application called "East-TecEraser."  In the internet history that was recovered, investigators saw that the user "stevens" had accessed a website called imagsrc.ru and downloaded several images of child pornography.  The downloaded images were recovered from the cache of defendant's browser and also found saved to defendant's computer.

Technicians made exact copies of the drives from defendant's computer and "restored" the system so they could examine some of the unique settings on the office tower.  They saw that the user "stevens" logged onto the computer nearly 300 times, that this user last logged onto the

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 7**

computer at 8:10 am on August 23, 2013, the day defendant was arrested, and that the file-wiping software was last run on August 22, 2013, at 7:43am. The office tower had a second encryption application loaded called StealthEncrypter – a program that uses steganographic encryption and operates to hide and encrypt a data file within a photo.

In an effort to bypass the encryption and fully analyze the contents of the office tower, the NWRCFL sent it to an FBI computer laboratory in Quantico, Virginia, which specializes in analyzing systems with cryptographic applications, and has greater capabilities than the NWRCFL.  After several months of analysis, the office tower system remained encrypted, and the data on the encrypted drive remained inaccessible.

A separate tower computer was seized from the defendant's living room (hereafter, the "living room tower").  The living room tower was analyzed in the spring of 2015 in preparation for defendant's trial in Washington County Circuit Court for crimes against *NS*, her two older sisters, and three boys who were friends with defendant's sons.[3]  Investigators recovered evidence of a chat conversation relating to the use of encryption, specifically an application called TrueCrypt.  The conversation discusses the strengths of this program and how it can be used to transfer files securely.  Technicians found evidence of a group of photos in defendant's email cache.  The photos had superimposed on them the phrase, "Then and Now."

---

[3]  Defendant was charged with a variety of offenses in Washington County in three separate indictments.  He pleaded guilty to Attempted Using a Child in a Display of Sexually Explicit Conduct and two counts Invasion of Privacy in case number C132673CR.  Defendant was convicted after a jury trial of six counts of Sex Abuse in the First Degree, two counts of Rape in the Second Degree, two counts of Sodomy in the Second Degree, and three counts of Using a Child in a Display of Sexually Explicit Conduct in case number C131929CR.  Defendant was acquitted of one count of Unlawful Sexual Penetration in that case, and one count of Sexual Abuse I in Washington County Circuit Court case number C140306CR.  Defendant has filed a notice of appeal of all his convictions.

**GOVERNMENT'S TRIAL MEMORANDUM**                                          **Page 8**

Some of the images recovered constituted child pornography (lascivious exhibitions of the children's genitals), others were non-pornographic, and in others, the persons depicted were post-pubescent and their ages could not readily be determined from their physical characteristics.

The living room tower computer also used an email program called "Thunderbird." Thunderbird uses a data cache that temporarily stores data "behind the scenes," typically without the user's knowledge.  The cache file from Thunderbird contained thumbnail photos of prepubescent children engaged in sexually explicit conduct, namely the lascivious exhibitions of their genitals.  The email address associated with the Thunderbird program was stevenrockett@comcast.net.

The living room tower also contained video files that appear to be cached data from an application called Pinnacle Studio. The recovered Pinnacle Studio files depicted naked young boys using a bathroom and shower. Investigators determined that the bathroom was from the home defendant lived in before he moved to Forest Grove, Oregon. They were able to positively identify two of the boys in the videos as *DS* and *BS* – young boys who played on the same baseball team as defendant's children.  Upon returning to the residence in Aloha, Oregon, investigators identified the bathroom depicted in the video from the physical layout of the bathroom and fixtures as well unique tiles visible in the video.  Investigators found a small patch in the wall consistent with the angle, height and location of the camera recording angle from the videos recovered from defendant's computer.  The patch was located in an unobtrusive location, near waist height and situated to record across the bathroom and into the shower area that was separated only by clear glass from the rest of the bathroom.

### D.    FBI Investigation

The FBI eventually joined the investigation.  In October, 2014, FBI Special Agent Denise Biehn went to Cebu City, Philippines.  She had a copy of the photograph of the minor children in the hotel room that Christine Rockett had identified, as well as a list of children who had communicated with defendant over Facebook.  SA Biehn and other agents met with and interviewed Filipino children and young adults who had contact with defendant from 2000-2012.  Many of those children independently told similar stories of how defendant would lavish them with gifts, and offer his hotel room to them to watch television, play games, and take hot showers (a luxury that few enjoy in the third world shanty town that is Cebu City).  SA Biehn met all the boys depicted in the photograph.  For various reasons, few of the witnesses in the Philippines have been willing to travel to Portland and testify against defendant as he is still held in high esteem within their community.  Some, however, told Agent Biehn that they had engaged in sexual activities with defendant while he was visiting the Philippines.

## IV.    ELEMENTS OF THE OFFENSES

### A.    Production and Attempted Production of Child Pornography Outside of the United States [18 U.S.C. §§ 2251(c) and (e))]

Count one of the second superseding indictment charges the defendant with production and attempted production of child pornography outside of the United States, intending that it be transported to the United States, in violation of 18 U.S.C. §§ 2251(c) and (e).  To establish that offense, the government must prove the following elements beyond a reasonable doubt: (1) at the time of the offense, the alleged victims were under the age of eighteen; (2) defendant employed, used, persuaded, induced, enticed, or coerced the minors to engage in sexually explicit conduct as defined in 18 U.S.C. § 2256(2) outside of the United States for the purpose of producing a

visual depiction of such conduct, or attempted to do so; and (3) defendant intended such depictions to be transported to the United States by means or facilities of interstate or foreign commerce. 18 U.S.C. §§ 2251(c), (e); Model Jury Instructions for the Ninth Circuit, § 8.181 (2014) (modified).

The term "sexually explicit conduct" means actual or simulated sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal), bestiality, masturbation, sadistic or masochistic abuse, and the lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2).  In determining what constitutes a "lascivious exhibition," courts generally look to six factors:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

United States v. Overton, 573 F.3d 679, 686 (9th Cir. 2009); United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986), aff'd sub nom. United States v. Weigand, 812 F.2d 1239 (9th Cir. 1987).  The factors "are neither exclusive nor conclusive, but operate as merely 'a starting point' for determining whether a particular image is 'so presented by the photographer as to arouse or

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 11**

satisfy the sexual cravings of a voyeur.'" *Overton*, 573 F.3d at 686 (citation omitted).  The jury

should not be made to rely on the so-called *Dost* factors "with precision to reach a mathematical

result, or to weigh or count them, or to rely on them exclusively."  *Id.* at 686-87 (internal

quotation marks and citation omitted).  Dost itself recognizes that a visual depiction "need not

involve all of these factors to be a 'lascivious exhibition of the genitals or pubic area.'"  636 F.

Supp. at 832.  Rather, the determination is made "based on the overall content of the visual

depiction, taking into account the age of the minor."  *Id.*

     Section 2251 prohibits "the inducement of children into sexual conduct for the purpose of

creating visual depictions of that conduct." *United States v. Smith*, 795 F.2d 841, 845 (9th Cir.

1986).  Section 2251 does not require "that the defendant's ultimate goal be distribution of the

visual depiction."  *Id.*  See also *United States v. McCalla*, 545 F.3d 750, 755 (9th Cir. 2009) (§

2251(a) "criminalizes the production of 'homegrown' child pornography"); *United States v.

Griffith*, 284 F.3d 338, 347 (2d Cir. 2002) ("§ 2251(a) does not require that a defendant produce

the sexually explicit depiction for commercial gain").  Nor is a completed visual depiction

required; § 2251 "does not require the actual production of a visual depiction, merely the

enticement of minors '*for the purpose of producing*' a visual depiction of sexually explicit

conduct." *Smith*, 795 F.2d at 846 (emphasis in original).

     Interstate nexus under § 2251(c) can be proved in either of two ways:  the defendant

"intends such visual depiction to be transported to the United States, its territories or possessions,

by any means, including by using any means or facility of interstate or foreign commerce"; or

the defendant "transports such visual depiction to the United States, its territories or possessions,

by any means or facility of interstate or foreign commerce."  18 U.S.C. § 2251(c)(2).

**GOVERNMENT'S TRIAL MEMORANDUM**          **Page 12**

Here, the government will show that defendant traveled from the United States to the Philippines, and induced children to come to his hotel room where he had hidden cameras staged to capture their images while they were naked. Defendant recorded the children in the shower, directing them to uncover their genitals. These images were then transported back to the United States and were subsequently seized from the defendant's Forest Grove home in August 2013 during the execution of the search warrant.

**B.      Engaging in Illicit Sexual Conduct in Foreign Places [18 U.S.C. §§ 2423 (c) and (e)].**

Defendant is charged in Counts 2 and 3 of the second superseding indictment with Engaging in Illicit Sexual Conduct in Foreign Places in violation of 18 U.S.C. §§ 2423(c) and (e). At the time he committed the offenses in those counts, Section 2423(c) provided:

> Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

The illicit sexual conduct need not occur *while* the defendant is traveling in foreign commerce; the defendant need only engage in illicit sexual conduct with a minor while in a foreign country. *United States v. Clark*, 435 F.3d 1100, 1107 (9th Cir. 2006). Some lag time between the foreign travel and the illicit sexual conduct is not fatal. *Id.* (upholding the defendant's conviction under § 2423(c) where he engaged in commercial sex acts with minors in Cambodia about two months after traveling there).

In order for the defendant to be found guilty of those charges, the government must prove the following elements beyond a reasonable doubt: (1) the defendant is a United States citizen; (2) the defendant traveled in foreign commerce; and (3) while the defendant was in a foreign place, he engaged in illicit sexual conduct with another person. 18 U.S.C. § 2423(c); *Clark*, 435

**GOVERNMENT'S TRIAL MEMORANDUM**                                      **Page 13**

F.3d at 1107; Model Jury Instructions for the Ninth Circuit, § 8.193 (2010) (modified); Pattern

Jury Instructions for the 11th Circuit § 93.3 (2010).

To "travel in foreign commerce" means that the defendant moved from a place within the

United States to a place outside the United States.  Travel between two foreign countries without

any territorial nexus to the United States does not constitute travel in foreign commerce under

§ 2423(c).  *United States v. Weingarten*, 632 F.3d 60, 70 (2d Cir. 2011).

The term "illicit sexual conduct" means a sexual act with a person under 18 years of age

"that would be in violation of chapter 109A if the sexual act occurred in the special maritime and

territorial jurisdiction of the United States," or any commercial sex act with a person under 18

years of age.  18 U.S.C. § 2423(f).  The term "sexual act" is defined by reference to 18 U.S.C.

§ 2246.  *Id.*  Section 2246 defines that term as follows:

> (A) contact between the penis and the vulva or the penis and the anus, and
> for purposes of this subparagraph contact involving the penis occurs upon
> penetration, however slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva, or
> the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of
> another by a hand or finger or by any object, with an intent to abuse,
> humiliate, harass, degrade, or arouse or gratify the sexual desire of any
> person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia of
> another person who has not attained the age of 16 years with an intent to
> abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of
> any person.

Thus, illicit sexual activity includes any commercial sex act with a person under 18,

aggravated sexual abuse of a minor, or sexual abuse of a minor under the age of 16.  *See* 18

U.S.C. § 2423(f); 18 U.S.C. §§ 2241(c), 2243.

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 14**

The government does not have to prove that the illicit sexual conduct is illegal in the country to which the defendant traveled, or that the defendant intended to engage in the illicit sexual conduct at the time he departed the United States. The government need only establish that defendant traveled in foreign commerce, and that he engaged in illicit sexual conduct while in a foreign country. *See Clark*, 435 F.3d at 1104-05 (the purpose of § 2423(c) was "to make it a crime for a U.S. citizen to travel to another country and engage in illicit sexual conduct with minors"; the government need only prove that "the defendant engaged in illicit sexual conduct with a minor while in a foreign country") (internal quotation marks and citations omitted); *United States v. Jackson*, 480 F.3d 1014, 1016-17 (9th Cir. 2007) (comparing § 2423(c) with 18 U.S.C. § 2423(b), which prohibits international travel by American citizens *for the purpose of* engaging in illicit sexual conduct).

Defendant is a United States citizen. His passports (one current, and one expired) were seized during the execution of a search warrant at his residence. The passports document his travel to the Philippines. Those trips are corroborated by bank and hotel records, by the testimony of witnesses who traveled with defendant, and individuals in the Philippines with whom defendant had contact during his visits. They are also corroborated by digital evidence from his computers that document his many trips to Cebu City.

When SA Biehn identified and contacted witnesses in Cebu City, several disclosed how defendant would buy them gifts and meals, and invite them to his hotel room where he would have them pair off to take showers. They described how defendant would come into the bathroom and photograph them with their clothes off. Several victims disclosed instances of sexual abuse, describing how defendant touched their naked genitals with his hand. Several witnesses spoke of defendant's reputation in Cebu City for having a sexual interest in children,

and how they believed defendant would give money or technological devices to children for sexual favors (including touching and oral sex).  Several children described how defendant would offer these items in exchange for naked photos of their bodies.

### C.    Attempted Production of Child Pornography [18 U.S.C. § 2251(c) and (e))]

Counts 4, 5, and 6 of the second superseding indictment charge defendant with attempted production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e).  To establish that offense, the government must prove the following elements beyond a reasonable doubt: (1) defendant intended to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; (2) defendant intended to produce the visual depictions using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer; and (3) defendant did something that was a substantial step toward committing the crime. 18 U.S.C. §§ 2251(c), (e); 18 U.S.C. §§ 2256(2) and (3); Model Jury Instructions for the Ninth Circuit, § 8.181 (2014) (modified); Model Jury Instructions for the Ninth Circuit, § 5.3 (2010) (modified).  The term "sexually explicit conduct" was discussed above.  The term "visual depiction" includes undeveloped film and videotape, and data stored on a computer disk or by electronic means which is capable of conversion into a visual image. 18 U.S.C. § 2256(5).  A "minor" is "any person under the age of eighteen years."  18 U.S.C. § 2251(1).

Interstate nexus under § 2251(a) can be proved in any of three ways: by proof that the defendant "knows or has reason to know" that the visual depiction "will be transported or transmitted using any means or facility of interstate or foreign commerce"; by proof that the

visual depiction "was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer"; or by proof that the visual depiction "has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce." *United States v. Sheldon*, 730 F.3d 1128, 1131 (9th Cir. 2013).

In this case, defendant's online communications demonstrate his careful plan to have others create child pornography and send it to him via electronic means in interstate and foreign commerce. Defendant's solicitation of images from *MG*, and then later with Charis Jumoa-as for images of *MG* and *HJ* (Counts 4 and 5) are explicit requests for sexually explicit images of children. He asks for naked photos of the children and offers gifts and money to Charis if she will send him the images. As to Count 6, defendant's Facebook messages to *NS* are insistent and demanding that she electronically send him lascivious images of her body – "front  and back" and "no shy" – terms *NS* understood to mean photos of her naked body.

In Counts 7 and 8, the government's theory is that the defendant both produced and attempted to produce child pornography. The government must establish the following elements: (1) the victims *DS* and *BS* were under the age of eighteen years at the time of the incident; (2) the defendant knowingly employed, used, persuaded, induced, enticed, or coerced *DS* and *BS* to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, or attempted to do so; and (3) the visual depictions were or would be produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer. As to the attempt theory, the government must further show that the defendant intended to commit the offense of production of child

**GOVERNMENT'S TRIAL MEMORANDUM**                                          **Page 17**

pornography, and that he did some act that was a substantial step towards committing that offense.

The government will offer the video evidence recovered from the living room computer, as well as the testimony of *DS*, *BS* and their mother to establish the circumstances surrounding their relationship with defendant, the timing of when the images were likely created, and the fact that the children had no idea they were being recorded when they used the bathroom at defendant's house. The government will establish that these images were created by a camera hidden in the wall of a guest bathroom in defendant's former residence in Aloha.

The government will show that the devices used to create these images, and the software that was used to edit the videos, were manufactured outside the state of Oregon, and therefore must have been shipped or transported in or affecting interstate or foreign commerce in order to be possessed and used here.

### D.    Possession of Child Pornography [18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2)]

Section 2252A(a)(5)(B) makes it an offense to knowingly possess material that contains an image of child pornography that has been mailed, shipped, or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer. Thus, to sustain a conviction under § 2252A(a)(5)(B), the government must prove the following elements beyond a reasonable doubt: (1) the defendant knowingly possessed material that contained one or more images of child pornography, which is defined as a visual depiction of a minor engaged in sexually explicit conduct; (2) the defendant knew the visual depiction(s) contained material that showed a minor engaged in sexually explicit conduct; and (3) the visual

**GOVERNMENT'S TRIAL MEMORANDUM**                                          **Page 18**

depiction(s) had either been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means including by computer, or were produced using materials that had been mailed shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

To establish possession, the government must prove "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it]." *United States v. Romm*, 455 F.3d 990, 999 (9th Cir. 2006) (bracketed material in original; internal quotation marks and citations omitted).  To establish knowledge, the government must prove that the defendant knew the material he possessed "contained an unlawful visual depiction." *United States v. Lacy*, 119 F.3d 742, 747 (9th Cir. 1997). Interstate nexus can be established in different ways.  For example, proof that an image was created in one state but possessed in another is sufficient to establish that it has been shipped or transported in or affecting interstate commerce. *United States v. Lynn*, 636 F.3d 1127, 1135 (9th Cir. 2011).  It is sufficient to show that the image "had previously moved in interstate commerce," even if it did so before being downloaded onto the defendant's computer. *Id.* at 1135-36.  The government can also establish interstate nexus by showing that the image was downloaded or copied onto a computer disk or other data storage medium that was manufactured outside of the state. *See United States v. Guagliardo*, 278 F.3d 868, 871 (9th Cir. 2002) (images were produced using materials that had been shipped or transported in interstate or foreign commerce when they were copied onto computer disks that were manufactured abroad); *Lacy*, 119 F.3d at 750 (the government established the jurisdictional element where it offered "undisputed evidence" that the computer hard drive, monitor, and disks the defendant used to download the images had traveled in interstate commerce).

**GOVERNMENT'S TRIAL MEMORANDUM**                                      **Page 19**

Here, in addition to the images of children he produced overseas, defendant possessed a host of images and videos depicting actual children engaged in sexually explicit conduct, including lascivious exhibitions of their genitals. The images were found on defendant's computer and other digital media storage devices in his home, his bedroom, and his office. These devices were manufactured either in whole or in part outside of the district of Oregon, and the government will be able to demonstrate that some of the images were downloaded from the Internet, which itself is a means or facility of interstate commerce. *See United States v. Tello,* 600 F.3d 1161, 1165 (9th Cir. 2010) (identifying the Internet as "an instrumentality of interstate commerce"). Defendant knowingly possessed child pornography.

## V.    ANTICIPATED DEFENSES

### A.    Improper Motive and Biases of the Government Witnesses

The government anticipates that defendant will challenge the motives, biases, and credibility of the victims and witnesses in this case. For example, several government witnesses have received benefits from the government in order to secure their presence for trial. The government has expended funds to assist victims, witnesses, and their guardians who live in the Philippines with obtaining necessary government documents (such as birth certificates and passports), and with travel arrangements to facilitate their travel from Cebu City in the Philippines to Portland, Oregon, for the trial. Without this government assistance, these witnesses, who are outside of the Court's subpoena power, would not be able to be present for trial. As part of defendant's sentences in Washington County, the court imposed a compensatory fine in the amount of $139,763.27 pursuant to ORS 137.101 payable to victim *NS* and her sisters. The government anticipates that defendant may attempt to impeach these witnesses with these facts in order to imply an improper motive for their testimony against him.

**GOVERNMENT'S TRIAL MEMORANDUM**                                              **Page 20**

### B.    Sufficiency of the Contraband Images

The government will offer images recovered from the defendant's computers and loose

digital media (SD digital storage cards) as well as the testimony of the victims and witnesses

describing the images defendant produced and attempted to produce as proof that defendant

produced, attempted to produce, and possessed child pornography, and produced and attempted

to produce child pornography abroad with the intent of transporting those contraband images to

the United States.  The government anticipates that defendant will argue that this evidence is

insufficient as a matter of law to meet the federal definition of child pornography.  However,

whether or not the images constitute child pornography, and whether or not defendant intended

and attempted to produce child pornography, are factual determinations for the jury to decide.

*United States v. Arvin,* 900 F.2d 1385, 1388 (9th Cir. 1990).  *See also Overton,* 573 F.3d at 688

(whether an image constitutes a "lascivious exhibition" is a question for the fact-finder).

The images that the government will present at trial do not depict mere nudity; instead,

they are carefully staged images that defendant created by using cameras hidden from view in

such a way to capture the genitals of children while they were naked.  Several courts have

recognized that children who are surreptitiously photographed while nude or partially nude

during the natural course of child behavior are victims as contemplated by 18 U.S.C. § 2251.

*See, e.g. United States v. Johnson,* 639 F.3d 433 (8th Cir. 2011); *United States v. Helton,* 302

Fed. Appx. 842 (10th Cir. 2008); *United States v. Clark,* 2010 WL 3488138 (D. Del. 2010).  The

*Dost* factors, discussed above, apply.

*Dost* recommends that "the trier of fact should look to" the six enumerated factors, but

noted that others "may be relevant in a particular case."  636 F.Supp. at 832.  At least two factors

**GOVERNMENT'S TRIAL MEMORANDUM**                                                    **Page 21**

are required to support a finding of lasciviousness. *United States v. Villard*, 885 F.2d 117, 122 (3rd Cir. 1989).

In this case, the government will present evidence at trial that will establish that the visual images defendant created have as their focal point the children's genitalia (factor 1), reveal children partially clothed or nude (factor 4), and were designed to elicit a sexual response in the viewer (factor 6). This defendant was not merely capturing images of the victims undressing; he had staged hidden cameras at waist height in locations where the children were likely to be naked. Additionally, some of the images recovered were residual/cache images from a software program called Pinnacle Studios – a video editing software that was found on defendant's computer. Thus, the jury can conclude that not only did defendant set up hidden cameras in bathrooms to record children he sent in to take showers, he then edited the resulting video footage in the software program installed on his computer. Taken together with defendant's online communications, it is clear that the defendant has a sexual interest in the children depicted, that his activity was inherently sexual, and that it was done with the intent of satisfying his sexual desires.

Several decisions illustrate this point. In *Johnson,* a weightlifting coach placed a hidden video camera in a sports medicine clinic and secretly taped minor girls stripping naked and weighing themselves in the examining room. Johnson adjusted the level of the zoom feature on the camera and the position of the scale to show the girls' pubic areas and remove their heads. Applying the *Dost* factors, the Eighth Circuit found the evidence sufficient to sustain the jury's finding that the images the coach created were "lascivious." 639 F.3d at 440-41. In *Helton,* the Tenth Circuit affirmed a conviction under § 2251(a) for a defendant who hid a camcorder in a bathroom with the lens focused on the toilet and the minor's pubic area, noting that the staging

**GOVERNMENT'S TRIAL MEMORANDUM**                                          **Page 22**

and surreptitious nature of the video made it sexually suggestive.  302 Fed. Appx. at 848-49.  In *Clark,* the district court denied a post-trial motion for judgment of acquittal where defendant surreptitiously captured images of a minor victim undressing in a bathroom.  2010 WL 3488138 at *5-6.  By contrast, a camera hidden in a tanning bed that captured only 1.5 seconds of full nudity and which did not focus upon the child's genital area was held insufficient to sustain a conviction under § 2251(a).  *United States v. Steen,* 634 F.3d 822, 824 (5th Cir. 2011).

A reasonable trier of fact could find that the images defendant created and attempted to create involved the lascivious exhibition of children's genitals based on the overall context and overall content of the videos and other relevant factors.  Defendant placed hidden cameras in bathrooms, and positioned them to capture images of children getting dressed and undressed, and using the toilet and shower.  Defendant is solely responsible for staging the scenes for the purpose of surreptitiously filming the children.  Defendant's actions in the videos also illustrate how important the camera angle was to him.  He is seen adjusting the camera in some of the videos.  In the case of the hidden camera in the Forest Grove house, the camera was recording images on a device controlled in defendant's bedroom, and in those images, defendant can be seen putting towels in areas where the child would have to stand in order for the hidden camera to capture their naked genitals.  A jury could conclude that these actions reveal defendant's intent to "arouse or satisfy the sexual cravings of a voyeur."  *Wiegand,* 812 F.2d at 1244.

Based on the content of the videos and the circumstances surrounding defendant's repeated, surreptitious production of them, the jury can reasonably conclude that defendant intended to illicit a sexual response in his audience – himself.  The evidence will be sufficient to sustain verdicts finding defendant guilty of each of the production and attempted production counts in the second superseding indictment.

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 23**

## VI.     EVIDENTIARY ISSUES

### A.     Fed. R. Evid. 609 and 414 – Defendant's Prior Convictions

Defendant has the following felony convictions:  Attempted Using a Child in a Display of Sexually Explicit Conduct in Washington County Circuit Court case number C132673CR; six counts of Sex Abuse in the First Degree, two counts of Rape in the Second Degree, two counts of Sodomy in the Second Degree, and three counts of Using a Child in a Display of Sexually Explicit Conduct in Washington County Circuit Court case number C131929CR.  Defendant has filed a notice of appeal of all his convictions.

The government intends to offer defendant's prior convictions in case number C131929CR under Fed. R. Evid. 414. The government has filed a separate notice as required by Rule 414, and incorporates the notice and legal arguments set forth therein by this reference.

If defendant takes the stand and testifies in his own defense, the government intends to offer the felony convictions in both cases to impeach his credibility under Fed. R. Evid. 609(a)(1)(B).  Under that rule, evidence of a prior felony conviction "must be admitted in a criminal case in which the witness is a defendant "if the probative value of the evidence outweighs its prejudicial effect to that defendant."  *See also United States v. Browne*, 829 F.2d 760, 762 (9th Cir. 1987).  In making that determination, courts look to five factors: (1) the impeachment value of the prior crimes; (2) the point in time of the conviction and defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.  *Id.* at 762-63.  The Court is not required to rule on this issue until it has heard the defendant's testimony.  See *Luce v. United States*, 469 U.S. 38, 43 (1984) ("to raise and preserve for

**GOVERNMENT'S TRIAL MEMORANDUM**                                            **Page 24**

review the claim of improper impeachment with a prior conviction, a defendant must testify"); *Browne*, 829 F.3d at 762 ("it is well within the district court's discretion to refuse to issue a ruling prior to hearing the defendant's actual, in-court testimony"; while the district court "has discretion to issue an advance ruling," it "need not do so, even if the refusal prevents the defendant from testifying in his own behalf") (internal quotation marks and citation omitted). Where a district court is unsure of whether to admit or exclude evidence of a prior conviction, "the better procedure" is for the court to wait until it knows "the precise nature of the defendant's testimony." *Browne*, 829 F.2d at 762 (quoting *Luce*, 469 U.S. at 41).

If defendant takes the stand and testifies, and particularly if he denies the allegations in the indictment, his credibility will become a key issue in the case. *See United States v. Givens*, 767 F.2d 574, 580 (9th Cir. 1979) ("Givens' proposed testimony, in which he would have denied committing the offense, would have placed his credibility directly at issue"). His convictions are well within the ten-year window; in fact, they are barely a year old. While they bear some similarity to the offenses in the indictment, a general similarity alone is not enough to warrant exclusion. Indeed, the Ninth Circuit has affirmed the admission of a prior conviction *identical* to the offense charged in the indictment. *See Browne*, 829 F.2d at 763 ("a prior bank robbery conviction [is] not inadmissible per se, merely because the offense involved was identical to that for which [the defendant] was on trial") (bracketed material in original; internal quotation marks and citation omitted). If defendant's prior convictions serve a proper impeachment

purpose, they, "like evidence of other crimes, may be admissible in spite of [their] similarity to the offense at issue." *Id. See also Givens*, 767 F.2d at 580.  Given the critical nature of defendant's testimony, the importance of assessing his credibility can outweigh even prejudicial convictions.  *See Browne*, 829 F.2d at 763-64.[4]

### B.    Other Act Evidence Under Fed. R. Evid. 404(b)

The government intends to offer other acts evidence under Fed. R. Evid. 404(b).  The nature of that evidence and the bases for its admission are set forth in detail in the government's Notice of Intent to Offer Other Act Evidence Under Fed. R. Evid. 404(b), filed separately.  The government incorporates the notice and legal arguments set forth therein by this reference.

### C.    Impeachment of Former Washington County Sheriff's Det. Erika Cox

Former Washington County Sheriff's Detective Erika Cox was the lead detective assigned to investigate the allegations concerning *NS* and her sisters.  Detective Cox also served as the primary investigator for at least three other investigations relating to defendant.  As the full extent of defendant's conduct came to light and the scope of the investigation broadened, state and local authorities referred the investigation to the FBI with respect to defendant's child pornography and foreign sex tourism activities.

In September 2014, the Washington County Sheriff's Office initiated an internal affairs investigation relating to Detective Cox's conduct.  The investigation ended when she resigned from the Sheriff's Office.  No findings were made in course of the investigation, nor were any of

---

[4]  The fact that defendant's convictions are pending on appeal does not render them inadmissible, although defendant can introduce evidence that an appeal is pending.  Fed. R. Evid. 609(f).

the allegations giving rise to the investigation sustained or substantiated.  Detective Cox resigned
without any threats or promises from the Sheriff's Office.

Erika Cox testified at defendant's state court trial.  During that trial, he sought to admit
evidence of the circumstances surrounding her resignation in order to impeach her credibility and
cast doubt on the sufficiency of her investigation.  Following an evidentiary hearing, the trial
court ruled that the allegations of misconduct against Detective Cox were highly tenuous and
amounted to impeachment on a collateral matter, and excluded the evidence.[5]

The government does not intend to call Erika Cox as a witness in this trial.  Nonetheless,
the defense has subpoenaed her for trial.  The lawyer who represented her in the state court trial
anticipates that Cox will likely invoke the protections of the Fifth Amendment and refuse to
testify about the circumstances surrounding the allegations of misconduct that prompted her
resignation.  A criminal defendant has no right to call a witness who he knows will invoke the
protections afforded the witness under the Fifth Amendment.  *United States v. Klinger*, 128 F.3d
705, 709 (9th Cir. 1997); *United States v. Diaz,* 237 Fed.Appx. 282, 283, 2007 WL 1814323 at
*1 (9th Cir. 2007).

In *Klinger*, the district court excluded the testimony of the defendant's accountant on the
basis of the accountant's anticipated invocation of his Fifth Amendment privilege against self-
incrimination.  128 F.3d at 709.  The Ninth Circuit affirmed on appeal.  The court held that "a
criminal defendant may not call a witness if that witness – whether or not a codefendant – will

---

[5]  The court later revised that ruling, holding that the State had opened the door to that evidence.
At the same time, the court also held that if defendant impeached Det. Cox's investigation, the
State would be allowed to offer evidence of the entire scope of the investigation, including many
facets that had previously been excluded by the court.  Defendant elected not to pursue that line
of impeachment.

merely be invoking his Fifth Amendment right not to testify." *Id.* (internal quotation marks and citation omitted).  While the district court may hold an evidentiary hearing of the witness's proposed testimony outside of the presence of the jury, it need not do so "if the court, based on its knowledge of the case and of the testimony expected from the witness, can conclude that the witness could legitimately refuse to answer essentially all relevant questions." *Id.* (internal quotation marks and citation omitted).  *See also Diaz*, 237 Fed. Appx. at 238 (affirming the district court's instruction to defense counsel to refrain from asking the defendant's wife questions that would cause her to invoke her Fifth Amendment right against self-incrimination, where the wife's attorney had already informed the parties that the wife would invoke the Fifth Amendment in response to most questions).

The government cannot see the purpose for which defendant would call Erika Cox other than to impeach her credibility.  However, a party may *not* call a witness solely to impeach her. *See United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990) (it was plain error for the government to "knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony"; impeachment "is not permitted where it is employed as a guise for submitting to the jury substantive evidence that is otherwise unavailable") (internal quotation marks and citations omitted).  While Erika Cox played a more pivotal role in the state case, her role in this federal case is attenuated.  She collected some items of evidence from defendant's residence and interviewed some witnesses.  She also conducted a recorded interview with defendant, but the government does not intend to offer defendant's statements at trial. Defendant cannot introduce his own statements through Erika Cox; offered by him, those statements are inadmissible hearsay under Fed. R. Evid. 801 and 802.

Erika Cox's credibility and investigative skills and techniques are of minimal probative value in this trial since much of the government's evidence against defendant comes from his online communications and the digital evidence seized from his residence.  Accordingly, the probative value of the unproven misconduct allegations is low, while the risk of unfair prejudice, confusion, and waste of time are substantial.  Fed. R. Evid. 403.  The court should exclude evidence of unproven allegations of misconduct on the part of Erika Cox, and should not allow defendant to call her as a witness solely for the purpose of impeaching her with otherwise inadmissible evidence.

### D.    Fed. R. Evid. 412 Evidence

Evidence of a victim's sexual behavior or sexual predisposition is not admissible in a criminal proceeding, except under certain limited circumstances.  Fed. R. Evid. 412(a).  Specific instances of a victim's sexual behavior is admissible in criminal cases only to prove two narrow points: (1) that someone other than the defendant was the source of semen, injury or other physical evidence; and (2) to prove the victim's consent to sexual conduct with the defendant, or if offered by the government.  Fed. R. Evid 412(b).  Rule 412 also contains a constitutional safety valve provision that permits evidence of a victim's past sexual history to be admitted when the exclusion of the evidence would violate the defendant's constitutional rights.  Fed. R. Evid. 412(b)(1)C).

The proponent of any evidence subject to Rule 412 is required to file a motion 14 days prior to the trial that specifically describes the evidence to be offered.  Fed. R. Evid. 412(c)(1).  The motion must state the purpose for which the evidence is being offered, and must be served on the opponent *and* the affected victim or the victim's representative.  *Id.*  Prior to the admission of such evidence, the court must conduct an *in camera* hearing and give the victim

**GOVERNMENT'S TRIAL MEMORANDUM**                                        **Page 29**

and the parties a right to attend.  Unless otherwise ordered by the court, any such motion, related materials, and the record of the hearing must be sealed.  Fed. R. Evid 412(c)(2).

To date, defendant has not served notice of his intent to offer any evidence of the sexual behavior of any of the victims.  Nor does the government seek to introduce evidence of other sexual acts of the victims (apart from those the victims engaged in with defendant).  The government objects to the admission of any evidence of other sexual acts engaged in by any of the victims.  There is no dispute as to the source of semen, injury, or other physical evidence. Since a child cannot lawfully consent to engaging in sexual relations with an adult, consent is not a defense to any of the charges in the second superseding indictment.

### E.  Contraband Images as Evidence

At trial, the government will be required to prove that the visual depictions defendant produced, attempted to produce, and possess are child pornography as defined under federal law. Accordingly, the government will have to show at least some of the images and videos to the jury.  The government does not intend to publish all of the child pornography it recovered in this case; rather, the government has selected a collection of still images and reconstituted video files that can be carefully and selectively displayed to the jury during trial.

Such an approach was approved by the Ninth Circuit in *United States v. Ganoe*, 538 F.3d 1117 (9th Cir. 2008).  There, the defendant offered to stipulate that the images found on his computer were child pornography, and that any reasonable person viewing the images would have recognized them as such.  *Id*. at 1120.  However, he refused to stipulate that *he* knew they were child pornography, or that they were recognizable as child pornography based on their titles.  *Id*. at 1120-21.  The district court admitted some of the images, finding them "extremely probative."  *Id*. at 1121.  However, the district court limited the number of clips the government

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 30**

could play, the clips were shown only once, and the district court "gave two cautionary instructions, directing the jury to view the images in an impartial and unbiased manner." *Id*. at 1124.  On appeal, the Ninth Circuit affirmed, holding that the district court "properly exercised its discretion in connection with the admission of the images." Id.  This Court took a similar, measured approach in *United States v. Logan Storm*, 915 F.Supp.2d 1196, 1206 (D. Or. 2012), *aff'd.,* 612 F. App'x. 445 (9th Cir. 2105).  In *Storm*, the Court considered each image of child pornography the government sought to offer, measured its probative value, weighed that value against the risk of unfair prejudice, and allowed the government to present some, but certainly not all, of the images of child pornography found on the defendant's computer equipment.  The Court leaned toward admission where images were found to have "multiple utility," in that they were offered as proof of multiple facts in dispute at the trial.  *Id.* at 1200.

The images and video clips the government seeks to publish in this case have multiple utility as well.  In addition to being prima facie evidence of the crimes alleged in Counts 1, 4, 5, 6, 7, 8 and 9, the images and video clips in this case demonstrate defendant's sexual interest in children.  They corroborate Christine Rockett's initial report to the police.  They show that defendant traveled to the Philippines, and had contact with multiple children in hotel rooms there.

Defendant is seen in the videos setting up the camera, which was hidden in a clock radio that was positioned on a counter opposite the shower and angled to capture anyone entering or leaving the shower or using the toilet.  He adjusts the angle of the camera.  His face appears in the videos.  He is seen entering and leaving the bathroom along with some of the Filipino children.  He is seen taking photographs of a young Filipino male who is performing oral sex on him in the shower.

**GOVERNMENT'S TRIAL MEMORANDUM**                                                          **Page 31**

The government intends to offer several video files at trial.  Those videos have been stitched together from the files recovered from defendant's computer.  The combined length of the files the government intends to offer is over one hour.  All of the video content is relevant and probative to the government's case; it demonstrates the circumstances surrounding the production of the videos, is evidence of defendant's knowledge and intent, and clearly demonstrates that naked children were not captured by accident.  Nonetheless, the government intends to publish only select clips of the videos (amounting to only a few minutes) to demonstrate the nature and qualities of the content of the videos, defendant's involvement in their production, the identities of the persons depicted in the videos, and the time, location, and circumstances surrounding the creation of the videos.

The government anticipates that defendant will argue that the probative value of these images is outweighed by the inflammatory and prejudicial nature of the images. Fed. R. Evid. 403.  However, the probative value and multiple utility of this evidence his high, particularly as to defendant's intent and knowledge, and whether the images amount to child pornography. Complicating this issue is the fact that the government was unable to fully analyze the contents of defendant's computer due to the encrypted volumes on the machine.  As such, the probative value of the selected images is high, and any prejudicial impact is minimal.

The government does not intend to overwhelm the jury with needless cumulative displays of naked children.  Rather, the government has carefully selected and collated the digital evidence in a manner that tells a logical story, is consistent with and corroborative of witness testimony, and provides a compelling narrative.  The government should be permitted to publish a reasonable number of images and video excerpts to the jury.

**GOVERNMENT'S TRIAL MEMORANDUM**                                                    **Page 32**

Pursuant to *United States v. Curtin*, 489 F.3d 935, 957 (9th Cir. 2007) (*en banc*), this Court must view all of the evidence (at that least to which defendant objects) and determine for each image whether its probative value outweighs its potential for unfair prejudice.  *Storm*, 915 F. Supp 2d. at 1205.

### F.   Fed. R. Evid. 1006 Summary Evidence

At trial, the government will present testimony from Abigail Schmidt, an investigative analyst for the FBI.  Ms. Schmidt analyzed various business records received from financial institutions, and hotels, as well as entry and exit stamps in defendant's two passports.  Based on her analysis, she compiled a summary of the dates of defendant's travel to and from the Philippines, how he got there, and where he stayed while he was there.  The government intends to offer that testimony as summary evidence under Fed. R. Evid. 1006.

Rule 1006, entitled "Summaries to Prove Content," provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.  And the court may order the proponent to produce them in court.

When considering the admissibility of summary evidence, courts distinguish between charts or summaries that are offered as substantive evidence, and those offered only as a testimonial aid.  *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991).  Charts and summaries admitted as evidence are governed by Rule 1006.  *Id.*  "In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves."  *Id.*  Summaries or charts used as testimonial aids "should not be admitted into evidence or otherwise be used by the jury during deliberations."  *Id.*

*But see United States v. Shirley,* 884 F.2d 1130, 1133-34 (9th Cir. 1989) (affirming the admission of summary testimony and charts prepared by a DEA agent detailing telephone calls made to and from various telephone numbers associated with the defendant's co-conspirators, even though the telephone records themselves were in evidence; summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses," and the district judge "specifically instructed the jury that the charts were not evidence," but were "used only for convenience") (internal quotation marks and citation omitted).

The proponent seeking to admit a summary as substantive evidence must establish the admissibility of the underlying documents as a condition precedent to the introduction of the summary. *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979). The proponent must also establish that the underlying documents were made available to the opposing party for inspection. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984). Evidence may be summarized by any qualified person who has examined the original documents and heard the testimony in court. *See, e.g. Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (affirming summary testimony by an IRS revenue agent in a tax deficiency case).

Ms. Schmidt's analysis was based on her review of business records received from financial institutions, hotels, and the like, which are admissible under Fed. R. Evid. 803(6). Copies have already been provided to defendant. Her summary of the contents of those records will make it easier for the jury to organize the information and save them from having to distill pertinent facts from voluminous records. Her summary testimony will be admissible under Rule 1006.

**GOVERNMENT'S TRIAL MEMORANDUM**                                    **Page 34**

### G.    Fed. R. Evid. 702 Expert Testimony

The government has filed an expert witness summary in this case.  Justin Lazenby, Michael Hanada, and Jennifer Wheeler are government witnesses with specialized knowledge that would be helpful to a jury in understanding the computer forensics and child-victim interviewing issues present in this case.  Fed. R. Evid.702.  The government relies on the facts provided in its expert witness summary, and for the sake of efficiency, will not repeat that information here.

## VII.    CRIMINAL FORFEITURE

The indictment contains two criminal forfeiture allegations: one under 18 U.S.C. § 2428 for the illicit sexual conduct counts, and the other under 18 U.S.C. § 2253 for the child pornography counts.  If defendant is convicted of any count in the indictment, the government will be seeking to forfeit the property listed in the government's forfeiture notice because these items contain contraband images, and were used by defendant to commit or facilitate the commission of the offenses in the indictment.

Fed. R. Crim. P. 32.2 sets forth the procedures governing criminal forfeiture.  Under Rule 32.2(b)(4), after the jury returns a verdict of guilty on the substantive criminal counts, either party can request a jury determination as to whether the government has established "the requisite nexus between the property and the offense committed by the defendant."  It is no longer necessary for the jury to determine the extent of the defendant's interest in the property; that issue is left for ancillary proceedings.  Fed. R. Crim. P. 32.2, Advisory Committee Notes[6].  It

---

[6] "Since the enactment of the ancillary proceeding statutes, the requirement in Rule 31(e) that the court (or jury) determine the extent of the defendant's interest in the property as part of the criminal trial has become an unnecessary anachronism that leads more often than not to

is the duty of the jury solely to determine whether the government has established the requisite nexus between the property subject to forfeiture and the offense for which the defendant was found guilty.

Under this approach, the jury must answer questions in a special verdict form which will allow the court to make the appropriate finding.  *See United States v. Amend*, 791 F.2d 1120, 1128 (4th Cir. 1986) (affirming the method by which the jury determined forfeitability; the jury answered questions whether property was acquired through the criminal enterprise, but trial court entered the order of forfeiture); *United States v. L'Hoste*, 609 F.2d 796, 813-14 (5th Cir. 1980) (forfeiture order is mandatory once jury determines essential factual issues required for forfeiture).  The government will submit a proposed special verdict in the form of an interrogatory which will require the jury to determine the essential factual forfeiture issue and secure the information necessary for the court to enter a forfeiture order.

Under this approach, where the jury resolves the factual elements necessary for a forfeiture order to be entered but the court enters the order, the jury is not advised of the ramifications of its decision – just as a jury is not advised of the ramifications of a verdict of guilt or innocence.  Thus, bifurcated proceedings are required.  However, given the fact that all the evidence necessary for the jury to determine whether or not the computer is forfeitable will be introduced in the government's case in chief, there should be no need to put on additional testimony in the bifurcated forfeiture proceedings.  A limited amount of argument may be necessary.

---

duplication and a waste of judicial resources."  Fed. R. Crim. P. 32.2(b)(4) Advisory Committee Note.

**GOVERNMENT'S TRIAL MEMORANDUM**                                          **Page 36**

If either party desires jury findings on the issue of forfeiture, supplemental instructions will become necessary.  The government will submit supplemental requested jury instructions on the issue of forfeiture determinations in a separate pleading.

Dated this 2d day of May 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Paul T. Maloney*
PAUL T. MALONEY, OSB #013366
Assistant United States Attorney

*/s/ Gary Y. Sussman*
GARY Y. SUSSMAN
Assistant United States Attorney